MOTOR WHEEL CORPORATION *v.* CHILDS.

Opinion delivered April 17, 1922.

1.  SALES—RESCISSION OF CONTRACT.—Where a buyer, on the seller's refusal to permit his inspector to examine articles sold, tele-graphed to seller: "Cancel order and forget it. Our man knows our requirements," and seller replied: "No stock being loaded. Trouble no inspector. If this man fair sample of your inspectors, the order is already canceled," there was a mutual rescission of the contract.

2.  CONTRACTS—ORAL AGREEMENT IN SUBSTITUTION FOR WRITTEN CON-TRACT.—An oral agreement to carry out a previously canceled written agreement according to its terms must be tested as an oral contract, as it depends for its existence upon an oral agreement.

3.  CONTRACTS—RESCISSION—CONSIDERATION.—A contract containing mutual obligations may be rescinded by mutual consent, such reciprocal obligations being the consideration for the rescission as well as for the original undertaking.

4.  EVIDENCE—PAROL EVIDENCE IN EXPLANATION OF WRITING.—A con-firmatory letter written by one of the parties after they had entered into an oral agreement of sale, which letter did not completely state the terms of the contract, was merely eviden-tiary in part of what the contract was, and therefore is subject to explanation by either party.

Appeal from Calhoun Circuit Court; *C. W. Smith,* Judge; reversed.

*E. L. Westbrooke,* for appellant.

The contract was rescinded by mutual consent by the passage of the various telegrams. 93 Ark. 447; 98 Ark. 219.

If one party furnishes a legal ground for rescission, his assent to a rescission declared by the other is unnecessary. 13 C. J. 601, § 624; 128 Ark. 535.

The parties made a new oral contract, which abrogated the written contract (92 Ark. 254; 146 Ark. 385; 136 Ark. 507; 5 Ark. 651) and thereafter the contract was on a "car to car" basis. There was no breach of this contract.

Had appellee interpreted the matter as a breach of the original contract and expected to insist upon the performance of that contract or demand damages for the breach thereof, he should have at once so notified the appellant. 83 Ark. 533; 55 Atl. 599; 6 R. C. L. p. 1025; 3 Elliott on Contracts, § 2032. His failure to do so amounted to waiver. Bishop on Contracts, § 792; 83 Fed. 684; 103 N. W. 112; 92 S. W. 88; 81 N. E. 574; 148 Fed. 145; 48 So. 213; 84 Pac. 232.

The verdict should have been set aside by the court. 126 Ark. 427; 47 Ark. 562; 98 Ark. 304; 94 Ark. 566; 100 Ark. 598; 98 Ark. 334; 129 Ark. 448; 133 Ark. 166; 132 Ark. 451; 125 Ark. 488.

*Wallace Townsend,* for appellee.

Appellee did not acquiesce in appellant's breach of the contract. Appellant was therefore liable in damages for the loss occasioned appellee. 93 Ark. 447.

The jury settled the conflict in the evidence. 108 Ark. 574.

The case was properly one for the jury. 71 Ark. 445; 105 Ark. 136. There being substantial evidence to sustain the verdict, the court was correct in not setting it aside. 15 Ark. 403; 15 Ark. 542.

McCULLOCH, C. J.   Appellee was the plaintiff below and sued appellant to recover damages in the sum of $23,532 for alleged breach of a contract between the

parties for the manufacture, sale and purchase of wood material for use in making automobile wheels. There was a trial of the cause before a jury, which resulted in a verdict in favor of appellee for the recovery of damages in the sum of $6,000, and an appeal has been duly prosecuted.

Appellant is a foreign corporation, organized under the laws of Michigan, but is doing business in the city of Memphis, Tennessee, and the transactions which form the basis of this litigation were conducted by appellant through its Memphis office.

Appellee was engaged in the manufacture of wood materials at Banks, Arkansas, and the contract involved herein was for the manufacture by appellee of automobile rim-strips and spoke-billets at his plant at Banks and the sale thereof to appellant at specified prices.

On July 31, 1920, the parties entered into a written contract whereby appellee agreed to manufacture and sell to appellant, at stipulated prices, twenty-five carloads of rim-strips and spoke-billets. Appellant agreed in the contract to purchase and accept said material subject to its own inspection at Banks when ready to load on railroad cars for shipment. The contract provided that shipment should start during the week beginning August 2, 1920, and be completed by November 1, 1920.

It is shown by the testimony that the first car for shipment under the contract was gotten ready immediately prior to August 18, 1920, and appellant sent its inspector, named Bastian, to Banks for the purpose of inspecting the stock as loaded on cars, as per contract, and on the day just mentioned a controversy arose between appellee and the inspector concerning the accuracy and correctness of the latter's inspection. This controversy resulted in a suspension of the loading of the car, and Bastian telegraphed appellant at its office in Memphis to the effect that the inspection had been stopped, and that the car was being loaded without inspection. Appellant thereupon sent to appellee a telegraphic message worded as follows:

"Bastian advises stock being loaded without inspection.  Order reads our inspection.  Wire trouble quick."

Appellee replied by wire on the same day as follows:

"If you want my stock, send inspector.  This man cannot inspect my stock."

Still later on the same day appellant sent the following message to appellee:

"Cancel order and forget it.  Our man knows our requirements."

Immediately on receipt of that message appellee sent the following by wire to appellant:

"No stock being loaded.  Trouble no inspector.  If this man fair sample of your inspectors, the order is already canceled."

This was the last communication between the parties at that time, but on the next day appellee appeared at appellant's place of business in Memphis, and they there entered into further negotiations concerning the transactions between them.

It is undisputed that there was an agreement entered into between the parties at the meeting in Memphis to the effect that appellee should proceed to manufacture rim-strips and spoke-billets and ship the same in carload lots to appellant, and that the latter should accept the same subject to inspection in Memphis, but there is a conflict in the testimony as to the full extent of the agreement made there between the parties.  Appellee testified that there was no new contract between the parties except with regard to the inspection, and that the agreement was that appellant should accept performance of the original contract, but that a few cars should be shipped to appellant at Memphis subject to inspection there and that if the inspection at Memphis did not prove satisfactory appellant would send another inspector to appellee's place of business at Banks for the purpose of inspecting the remainder of the stock to be shipped under the contract.

On the other hand, appellant contends, and the witnesses introduced tend to establish the fact, that the ne-

gotiations and agreements between the parties at Memphis had no reference to the original contract, which had already been canceled and rescinded, but that a new oral contract was entered into whereby appellee agreed to ship carloads of stock to Memphis subject to inspection by appellant there, and that appellant was only to accept such number of cars on those terms as appellee was willing to ship from time to time, and that there was no agreement with respect to the number of cars to be shipped under those terms.

There is no controversy, however, that the price of the stock was the same as that specified in the original contract.

After this meeting between the parties at Memphis, appellee returned to Banks, and the next day appellant mailed to appellee the following letter:

"Confirming our conversation had with you while at our office today with reference to order for automobile strips and billets which you hold, it is our understanding that you will try out a few cars and ship same subject to inspection at the factory, shipping the hickory and oak rim-strips to Lansing and the spoke-billets to Memphis, you to draw on us at Memphis through the Commercial Trust & Savings Bank for 80 per cent. of the invoice, we to send you inspection report and balance promptly on receipt of inspection report. It is also understood that we are to take about 25 per cent. red oak in the 54-inch lengths, truck rims only, you making the 45-inch lengths out of hickory only."

This letter was received by appellee, and it is the only written communication between the parties bearing directly upon the details of the transactions between the parties at Memphis on the occasion above mentioned.

The contention of appellant is that this letter had reference solely to the new oral agreement made in Memphis. But, on the other hand, the contention of appellee is, and he testified to that effect, that this letter had reference to the original written contract, or "order"— as the witness designated the contract.

Appellee then proceeded to make shipment to appellant, and the car, the shipment of which had been held up on account of the controversy concerning the inspection, was shipped by appellee to appellant, and the latter accepted and paid for the same on the terms contended for by appellee. There were four carloads shipped, two cars of strips and two cars of billets.

On September 11, 1920, appellee mailed to appellant a letter requesting the latter to send an inspector to load out the stock. That portion of the letter which has bearing upon the present controversy reads as follows:

"Would like for you to send an inspector to load out the stock which I sold you. It takes so long to get a report on car after it is shipped. I have four cars which I shipped to West Chester in June that I have no report on. * * * * * * I do not care to load out any more stock until I get a report on at least one or two cars that I have shipped you. It seems that the first car that I shipped should have been in before this time.

"The last time I was in Memphis, we had an agreement that I was to draw 80 per cent. on the stock. The first draft was returned, but finally paid. You wrote me a letter authorizing me to draw on you for 80 per cent., and to send a draft to a certain bank in Memphis. I did this, with invoice and B/L attached to draft.

"I made a deal with you for this stock, and turned down a deal as fully as good, and with quite a lot less trouble to handle, for this one.

"Let me know when you can have an inspector here, so I can get some cars placed."

On September 13 appellant wired appellee as follows: "Stop all production for us. Wire amount now cut. Writing." This was followed up by a letter mailed by appellant to appellee confirming the telegram and explaining that the necessity for canceling the business relations between the parties was the decline in the automobile industry, and the letter concluded with the following paragraph:

"It is our intention to take such stock as you have out and cut for us, but cannot take more than what you have cut on receipt of our wire, unless it is necessary to cut just enough to make a minimum car. Advise amount cut, and we will send inspector."

On receipt of this letter, appellee wrote to appellant as follows:

"I have car rims and car billets. Will wire as soon as I get cars placed, so you can send inspector. You could not use two more cars on the order given me, besides the two I have cut, could you? I have gone to considerable expense to get this order out, and feel that you should take what timber I have out. I have the logs on the road, and would have had them all cut, but the railroad would not furnish me with cars to move them. Let me hear from you by return mail. Also let me know if you can send inspector on short notice."

The two cars referred to in the above letter were shipped out and were received by appellant at destination.

On September 16 appellee sent a wire to appellant requesting the latter to send an inspector, and appellant replied as follows:

"Impossible send inspector quick. Stack stock on hand. Cut one car each hickory billets strips. Will send best inspector latter part of next week. Load everything cut then."

There were other telegrams that passed between the parties with respect to the inspection of the cars, but they relate to cars which appellant had expressed a willingness to accept.

On October 25 appellee wired to appellant notifying it that he had a car of rim-strips and about a car of billets, and asked for an inspector. One of appellant's employees went to Banks on November 1, according to his testimony, for the purpose of making an inspection, but claims to have found no stock ready. This was the last transaction between the parties.

Among other instructions, the court gave the following, over the specific objection of appellant:

"If you find defendant breached its contract of July 31, 1920, with plaintiff, and if you find the plaintiff sustained damages by such breach, and if you do not find that plaintiff acquiesced in the action which he alleges to be a breach of the contracts, you are instructed that plaintiff's damages is the difference between the contract price of the total amount of strips and billets which defendant contracted for but refused to take and the total cost of the manufacturing and loading them on the cars ready for shipment."

This instruction was erroneous and prejudicial, for the reason that it submitted to the jury the question whether or not the original contract of July 31, 1920, had been canceled without the consent of appellee, and whether there had been a breach of that contract without the acquiescence or consent of appellee.

We are of the opinion that, according to the undisputed evidence, the original written contract between the parties was rescinded by the communications between them on August 18, 1920, which were in the form of telegraphic messages and about which there is no dispute.

After appellee had unequivocally refused to permit Bastian to inspect the stock, appellant sent the following message: "Cancel order and forget it. Our man knows our requirements." This was a distinct and unequivocal proposal to cancel or rescind the contract on account of the controversy with regard to the inspection, and appellee made the following answer to that proposal: "No stock being loaded. Trouble no inspector. If this man fair sample of your inspectors, the order is already canceled." No other interpretation can be placed upon the language of this message than that it was an acceptance of appellant's proposal to cancel the contract on account of the controversy with regard to the inspection.

It is true that this message stated the qualification that if Bastian was a fair sample of the inspectors sent out by appellant the order was already canceled, but the

parties had already come to the distinct disagreement about the inspection, and the message reads that the contract "is already canceled," meaning, necessarily, that the cancellation resulted from their failure to agree upon the proper man to do the inspecting.

There was undoubtedly a complete acquiescence on account of the controversy between the parties that they would cancel or rescind the contract and not insist upon a further effort to perform it according to its terms.

The court erred, therefore, in giving this instruction, for it permitted the jury to find that this contract was still in force, and that appellant's refusal by telegram dated September 13 to accept any more stock further than the carloads already manufactured was a breach of this contract.

If the original contract was in force, the telegram of September 13 was a breach thereof because it constituted a refusal to accept any more carloads other than those already manufactured and ready to ship.

Appellant's contention is that this telegram was not a breach of its contract, for the reason that the original written contract had been rescinded, and that, under the terms of the oral contract made in Memphis on August 19, it was not bound to accept any definite number of carloads of stock.

It was a question for the jury to determine what the contract made in Memphis on August 19 was,—whether it amounted, as contended by appellee, to an agreement of sale according to the terms specified in the original written contract, or whether it was merely a contract, as contended by appellant, for the acceptance of such amount of material as appellee should see fit to ship.

Since we find that the original written contract was canceled by the telegraphic correspondence on August 18, it follows that the contract negotiated in Memphis on the following day was an oral one, notwithstanding it had reference to the sale of stock according to prices mentioned in the written contract. Even if it was an agreement to carry out the original contract according to its

terms, it must be tested as an oral contract, for it depended, for its existence, upon an oral agreement. *Izard* v. *Connecticut Fire Ins. Co.,* 128 Ark. 433.

The original contract contained mutual obligations of the respective parties, and it was within their province to rescind it by mutual consent, such reciprocal obligations being the consideration for the rescission as well as for the original undertaking. So, after the original contract had been rescinded, the parties could, and, according to the testimony adduced on the part of appellant, did, enter into negotiations for a new contract covering the subject-matter of the old contract.

This new contract was, as before stated, an oral one, even though it adopted the terms of the old contract by reference thereto. The confirmatory letter written by appellant to appellee on the next day was not complete in itself so as to state the terms of the new contract. It was therefore merely evidentiary, in part, of what the contract was and is subject to explanation by either party.

This state of the proof makes it a question for the jury to determine what the extent of the contract was that was entered into between the parties on the occasion named, and the case should have gone to the jury solely on that question and on the question of the alleged breach thereof.

It is true that appellee in the complaint asserted the right of recovery solely on the original contract, but proof was directed towards the transaction between the parties on the occasion of their meeting in Memphis, and as this testimony was introduced without objection, it constituted an election to treat the pleadings as amended so as to conform to the proof.

We cannot sustain the judgment, however, upon a presumed finding of the jury in favor of appellee on that issue, for the jury may have based the verdict upon the finding that the original written contract had not been rescinded,

The court gave, at appellant's request, an instruction (No. 4) setting forth the correspondence between the parties between the dates of September 15, 1920, and October 25, 1920, and concluded with directions to the jury that if they found that appellant "within a reasonable time sent an inspector to inspect and accept such material as was tendered by plaintiff, and on arrival of inspector at plaintiff's premises plaintiff had no stock on hand to inspect of the kind embraced in the contract, that there was no refusal of defendant to comply with the terms of the contract."

This instruction was more favorable to appellant than it was entitled to, for it assumed that appellee had acquiesced in the agreement to insist on the shipment of only such stock as had been manufactured. It was a question for the jury to determine whether or not, from this correspondence, appellee acquiesced in the terms proposed by appellant in its letter of September 13 confirming the telegram with regard to accepting no more stock except that which had been manufactured.

For the error in giving instruction No. 3 over appellant's specific objection, the judgment is reversed and the cause remanded for a new trial.